**E-FILED**
Wednesday, 08 May, 2013  04:09:49 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

JULIE D. PIPER,                          )
                                         )
    Plaintiff,                       )
                                         )
        v.                      )        Case No.   12-cv-1134
                                         )
MICHAEL J. ASTRUE, *Commissioner of* )
*Social Security*,                       )
                                         )
    Defendant.                       )

# O R D E R  &  O P I N I O N

This matter is before the Court on Plaintiff's Motion for Summary Judgment (Doc. 11) and Defendant's Motion for Summary Affirmance (Doc. 14). Plaintiff's Motion for Summary Judgment seeks judicial review of the Commissioner of Social Security's final decision to deny her disability insurance benefits. (Doc. 1). Plaintiff filed an accompanying Motion for Leave to File Excess Pages along with her Motion for Summary Judgment. (Doc. 10). The Court finds that Plaintiff sufficiently explained the need to file excess pages and thus grants her Motion to File Excess Pages. For the reasons stated below, however, Plaintiff's Motion for Summary Judgment is denied and Defendant's Motion for Summary Affirmance is granted.

## PROCEDURAL HISTORY

On July 20, 2009, Plaintiff Julie D. Piper applied for a period of disability and disability insurance benefits under Title II of the Social Security Act (the "Act"), alleging that she became disabled with back disorders as of September 25, 2006. (R. at 19, 21, 189). Her claim was denied initially on September 2, 2009, and again

upon reconsideration on December 14, 2009. (R. at 110, 118). Plaintiff then requested a hearing on December 31, 2009, which was held on February 11, 2011. (R. at 35, 123). Plaintiff, her husband, her daughter, and an impartial vocational expert testified at the hearing. (R. at 19). In a written decision issued on March 3, 2011, Shreese M. Wilson, the Administrative Law Judge (the "ALJ") who presided over the hearing, determined that Plaintiff had severe back impairments but none that rendered her disabled under the Act. (R. at 16-29). Plaintiff filed a request for appeal, but the Appeals Council denied Plaintiff's request on April 3, 2012, thus making the ALJ's decision the final decision of the Commissioner of Social Security. (R. at 1-3). Plaintiff then filed the present action on April 30, 2012, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (Doc. 1).

## LEGAL STANDARDS

### I. Disability Standard

To qualify for disability insurance benefits under Title II of the Social Security Act, a claimant must prove that she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 416(i)(1); 42 U.S.C. § 423(d)(1)(A). The medical impairment must either "be expected to result in death", or must have lasted or "be expected to last for a continuous period of not less than 12 months." *Id.* Additionally, a claimant must satisfy an "insured status" requirement by demonstrating that her earnings record has acquired sufficient quarters of coverage to accrue disability insurance benefits, and that her disability began on or before the date that insurance coverage ended. *See* 42 U.S.C. § 416(i); 42 U.S.C. § 423(c).

The Commissioner will consider the evidence available in a claimant's case record and make factual determinations to establish whether the claimant is then entitled to any benefits. *See* 42 U.S.C. § 405(b)(1); 42 U.S.C. § 423(d).

The Commissioner applies a five-step sequential analysis to determine whether a claimant is disabled, and thus, entitled to benefits. 20 C.F.R. § 404.1520; *see also Maggard v. Apfel*, 167 F.3d 376, 378 (7th Cir. 1999). The claimant has the burden of proving the existence of a disability through the first four steps of the analysis by demonstrating that she has a sufficiently severe impairment that precludes her from engaging in past work. *McNeil v. Califano*, 614 F.2d 142, 145 (7th Cir. 1980). The claimant must provide objective medical evidence of "the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged." 42 U.S.C. § 423(d)(5)(A). A claimant's statements as to pain or other symptoms alone will not suffice. 42 U.S.C. § 423(d)(5)(A). If a claimant meets this burden, it then shifts to the Commissioner to prove that the claimant can still perform some other kind of "substantial gainful employment." *Id*.

The five-step analysis more specifically breaks down into the following sequence:

1) The Commissioner determines whether the claimant is presently involved in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant engages in substantial gainful activity, she is not disabled. *Id*. If she does not, the Commissioner proceeds to the next step. 20 C.F.R. § 404.1520(a)(4).

3

2)   The Commissioner determines whether the claimant has a severe medically determinable physical or mental impairment that meets the durational requirement.   20 C.F.R. § 404.1520(a)(4)(ii). A severe impairment is one that significantly limits the claimant's physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(c).  If the claimant's impairments or combination of impairments is not severe, she is not disabled.  20 C.F.R. § 404.1520(a)(4)(ii).  If the impairment(s) is severe, the Commissioner will move to the next step.

3) The Commissioner will compare the claimant's impairment(s) to those in a list of impairments to determine if the impairment(s) meets or medically equals the criteria of a listing.  20 C.F.R. § 404.1520(a)(4)(iii); 20 C.F.R. Part 404, Subpart P, Appendix 1.  If the claimant's impairment(s) meets or medically equals a listed impairment, the Commissioner will find her disabled without needing to consider the claimant's age, education, or work experience.  20 C.F.R. § 404.1520(d).

4) If the claimant's impairment(s) does not meet or medically equal a listed impairment, the Commissioner will review the evidence to consider the claimant's residual functional capacity and her past relevant work.   20 C.F.R. § 404.1520(a)(4)(iv).  If the claimant can still meet the physical and mental demands of her past relevant work, she is not disabled.  *Id.*; 20 C.F.R. § 404.1520(f).

5) If the claimant cannot perform her past relevant work, the Commissioner will determine whether the claimant can adjust to other work by considering the claimant's residual functional capacity, age, education, and work experience.  20 C.F.R. § 404.1520(a)(4)(v).  If the claimant cannot adjust to other work, then she is disabled. 20 C.F.R. § 404.1520(g).  Otherwise, she is not.  *Id*.

## II. Standard of Review

"The standard of review that governs decisions in disability-benefit cases is deferential." *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). When a claimant seeks judicial review of an ALJ's decision to deny benefits, the Court must only "determine whether [the ALJ's decision] was supported by substantial evidence or is the result of an error of law." *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). Forty-two U.S.C. section 405(g) governs the Court's review, by providing, in relevant part, that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence is defined as "'such evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Maggard*, 167 F.3d at 379 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

To determine whether the ALJ's decision is supported by substantial evidence, the Court will review the entire administrative record. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). The Court will not, however, "reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Id.* Credibility determinations by the ALJ are particularly not upset "so long as they find some support in the record and are not patently wrong." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994). Moreover, while the Court must ensure that the ALJ "build[s] an accurate and logical bridge from the evidence to his conclusion," he need not address every piece of evidence. *Clifford*, 227 F.3d at 872. Instead, the Court must remand the case

only where the decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

## BACKGROUND[1]

Plaintiff was forty-two years old at the time of her alleged disability onset date of September 25, 2006. (R. at 193). Her disability insurance coverage extended until December 31, 2011, and she applied for disability insurance benefits on July 20, 2009. (R. at 189, 193).

## I. Relevant Medical History[2]

On September 25, 2006, Plaintiff saw her primary care physician, Dr. Manuel Ascano, following a work injury that caused her lower right back pain and numbness in her right thigh. (R. at 425). Plaintiff explained that she was transporting a large patient sitting in an oversized wheelchair from the nursing home where she worked to the doctor's office, and that she injured herself when she

---

[1] While the Court reviews the entire administrative record, it focuses its analysis and discussion on the issues and evidence raised by the parties. Local Rule 8.1(D) obligates a plaintiff to "cite to the record by page number the factual evidence which supports the plaintiff's position." CDIL-LR 8.1(D). Thus, the Court will not scour the record for additional evidence that might support a plaintiff's claims. Furthermore, because Plaintiff is represented by counsel, the failure to cite particular pieces of evidence in the record will be deemed a waiver of Plaintiff's reliance on that evidence.

[2] In her brief, Plaintiff references additional medical records that were created after the ALJ hearing and submitted to the Appeals Council. (Doc. 12 at 12). The Court will not consider those records, however, because the additional evidence was not before the ALJ, and because the Appeals Council refused Plaintiff's request to review the ALJ decision. *See Farrell v. Astrue*, 692 F.3d 767, 770 (7th Cir. 2012) ("Evidence that has been rejected by the Appeals Council cannot be considered to reevaluate the ALJ's factual findings."). Furthermore, Plaintiff challenges only the ALJ decision and not the Appeals Council's decision to reject her appeal; thus, the only relevant evidence for review here is the evidence before the ALJ at the time she made her decision. *See id.* ("[W]hether the ALJ's decision is supported by substantial evidence is not the same question as whether the Appeals Council properly rejected [Plaintiff's] appeal.").

lifted the wheelchair to push it through a doorframe.  (R. at 52-53, 425).  Dr. Ascano

assessed Plaintiff with low back pain and lumbar radiculopathy,[3] advised an MRI of

the lumbar spine, and prescribed her Celebrex.[4]   (R. at 426).  Plaintiff stopped

working after her visit to Dr. Ascano and began receiving Workers' Compensation

benefits for her injury.  (R. at 189-90).

Plaintiff's MRI showed a new small right paracentral disc protrusion that

caused mild thecal sac effacement[5] at the L4/5[6] level and an existing central disc

herniation[7] that caused mild thecal sac effacement at the L5/S1 level of her lumbar

spine.  (R. 486).  Plaintiff also had mild multi-level degenerative endplate changes[8]

involving the lumbar spine but no compression fractures or significant subluxation.[9]

(R. at 486).  On November 8, 2006, Plaintiff saw Dr. Deofil Orteza for a series of

L4/5 lumbar epidural steroid injections to treat her low back pain.  (R. at 289-92).

---

[3] Lumbar radiculopathy is "any disease of the lumbar nerve roots, such as from disk herniation or compression by a tumor or bony spur, with lower back pain." *Dorland's Medical Dictionary*, http://www.dorlands.com (last visited Apr. 24, 2013) [hereinafter *Dorland's*].

[4] Celebrex is an anti-inflammatory drug used to treat various symptoms of arthritis. *Dorland's*.

[5] The thecal sac is the "dura mater of the spinal cord," which is the "outermost, toughest, and most fibrous of the three membranes" that cover the spinal cord. *Dorland's*.  Thecal sac effacement can occur when a vertebral disc comes into contact with the thecal sac.

[6] L4/5 and L5/S1 are classifications of vertebrae placement.  *Dorland's*.

[7] Central disc herniation occurs when semifluid mass in the central portion of an intervertebral disk protrudes.  It occurs most often in lumbar vertebrae and can impinge on the nerve roots.  *Dorland's*.

[8] Vertebral endplate changes are most common at the L4/5 and L5/S1 levels and are associated with increasing age.  They generally occur adjacent to degenerated or herniated intervertebral discs.  R. Rahme & R. Moussa, *The Modic Vertebral Endplate and Marrow Changes: Pathologic Significance and Relation to Low Back Pain and Segmental Instability of the Lumbar Spine*, 29 Am. J. Neuroradiol. 838, 838 (2008).

[9] Subluxation is an incomplete or partial dislocation of the vertebrae.  *Dorland's*.

At the time of her visit to Dr. Orteza, Plaintiff was taking the prescription drugs Celebrex and Darvocet.[10]  (R. at 289).  Dr. Orteza reported Plaintiff as a "healthy-looking female . . . in good general health," but noted that she had episodes of headaches related to her migraine headaches.  (R. at 290).  He also reported that she had normal gait and a clinically straight back and that her musculoskeletal system was "unremarkable except for . . . low back pain with radicular pain along the anterior aspect of the right thigh and leg."  (R. at 290).  Plaintiff saw Dr. Orteza for two more lumbar epidural steroid injections over the course of the month.  (R. at 281, 285).  At her third appointment, Dr. Orteza noted that Plaintiff reported improvement of her pain by at least sixty percent after her previous epidural steroid injection, and thus did not contemplate any further follow-up appointments unless her pain became significant again.  (R. at 281).

In addition to epidural steroid injections, Plaintiff was also advised to undergo physical therapy to manage her low back pain. (R. at 298-309).  On December 7, 2006, Deb Austin, a physical therapist, reported that Plaintiff expressed pain of up to ten out of ten after prolonged walking and during the evaluation of her lumbar spine flexion[11] after full extension, but that her pain was usually five out of ten.  (R. at 299-300).  Ms. Austin also noted that Plaintiff was limited to seventy percent flexion and eighty-five percent extension abilities, but that she could rotate her back within normal limits.  (R. at 299).  Plaintiff also had

---

[10] Darvocet is a pain reliever used to relieve mild to moderate pain.  It was withdrawn from the U.S. market in November 2010.  *Dorland's*; *Darvocet*, Drugs.com, http://www.drugs.com/darvocet.html (last visited May 1, 2013) [hereinafter *Drugs.com*].

[11] Flexion is "the act of bending or condition of being bent."  *Dorland's*.

independent gait and posture but they were noted as antalgic[12] and slow.  (R. at 299).  She was advised to undergo continuing therapy and attended twenty-one sessions between December 7, 2006 and February 5, 2007.  (R. at 297, 301).  By March 21, 2007, however, Plaintiff's physical therapy order expired because she had not attended for over thirty days.  (R. at 297).

In January and February 2007, Plaintiff visited Dr. Ascano with complaints of head and chest congestion, coughing, ear aches, headaches, sinus pressure, and aggravated back pain because of her sneezing.  (R. at 413, 415).  Dr. Ascano assessed Plaintiff with asthmatic problems and nicotine addiction, recommended an MRI, prescribed antibiotics, and advised her to quit smoking.  (R. at 413-14).  She was also prescribed a Lidoderm patch for her back.[13]  (R. at 413).  Between January 2007 and July 2007, Plaintiff complained of headaches, sinus pressure, and neck pain on several different occasions.  (R. at 403, 405, 407, 409, 411, 413, 414-15).

On February 22, 2007, Plaintiff got another MRI that showed that the right paracentral disc protrusion causing mild thecal sac effacement had regressed, that the central disc herniation remained unchanged, and that Plaintiff had developed mild spinal stenosis[14] at the L4/5 level with borderline stenosis at the L5/S1 level.  (R. at 484-85).  Mild foraminal[15] stenoses were also present at the L4/5 and L5/S1

---

[12] Antalgic gait is "a limp adopted so as to avoid pain on weight-bearing structures (as in hip injuries)."  *Dorland's.*

[13] A Lidoderm patch is a type of numbing medication that blocks nerve signals to the body.  *Drugs.com.*

[14] Spinal stenosis occurs when bone encroaches on the vertebral canal, nerve root canals, or intervertebral openings of the lumbar spine and narrows the space upon which it encroaches.  The condition can be either congenital or result from spinal degeneration and includes symptoms of pain.  *Dorland's.*

[15] Foramina are natural openings through a bone.  *Dorland's.*

levels, but there were no compression fractures, subluxation or abnormal enhancements noted. (R. at 485).

On April 17, 2007, Dr. Kern Singh, a spinal surgeon, performed a microscopic lumbar laminectomy[16] to correct Plaintiff's lumbar spinal stenosis and lumbar radiculopathy at the L5/S1 level. (R. at 330). No complications were noted. (R. at 330). About ten days later, Plaintiff went to the emergency room for moderate but sharp neck pain and sinus drainage. (R. at 311). The emergency room physician, Dr. Maya Jagasia, diagnosed Plaintiff with an acute myofascial strain[17] and acute vertigo and recommended that she start taking the pain pills that she was prescribed after her back operation, because Plaintiff reported that she was not taking her pain medication. (R. at 311-12).

Plaintiff had a third MRI on May 8, 2007. (R. at 480). The MRI reflected that a central disc herniation had been removed but found laminectomy defects of a residual or recurrent smaller central disc herniation causing mild thecal sac effacement, as well as enhanced granulation tissue[18] within the operative bed. (R. at 480). Dr. Singh reviewed the MRI and concluded that because there was no evidence of a dural leak that Plaintiff's complaints of headaches appeared to be unrelated to her spine procedure. (R. at 346). He also found no objective evidence

---

[16] A microscopic laminectomy is a minimally invasive surgery to remove the posterior arch of a vertebra. *Dorland's*. During the procedure, the surgeon opens up the spinal canal and removes bones and damaged disks to make more room for the spinal nerve and column. It is often used to treat spinal stenosis. *U.S. National Library of Medicine*, http://www.nlm.nih.gov/medlineplus/ency/article/007389.htm (last visited Apr. 24, 2013).

[17] A myofascial strain is a strain involving a sheet or band of fibrous tissue surrounding the muscle tissue. *Dorland's*.

[18] Granulation tissue is "the newly formed vascular tissue normally produced in the healing of wounds of soft tissue and ultimately forming the cicatrix." *Dorland's*.

that precluded Plaintiff from returning to work at a light duty level, with less than fifteen pounds of lifting and push/pull and minimal bending, kneeling, or stooping. (R. at 346).  Dr. Singh surmised that Plaintiff could remain at the light duty level while she completed physical therapy, at which point she would reach Maximum Medical Improvement.[19]  (R. at 346).

In May 2007, Plaintiff visited Dr. Ascano twice with complaints of nausea, vomiting, headaches and shooting neck pain when she moved her neck, as well as occasional back and tailbone pain when sitting.  (R. at 407, 409).  He diagnosed her with a cervical sprain and spinal headache and renewed her prescription medication.  (R. at 408, 410).  Soon thereafter, on May 25, 2007, Plaintiff had a second laminectomy and lumbar wound irrigation and debridement to treat a superficial wound infection from her first procedure.  (R. at 328).  Dr. Singh did not find evidence of a dural leak or leakage of the cerebrospinal fluid during surgery, but did find a tear in the dura mater and a small bleb[20] in the midline.  (R. at 328). He wrote a post-operative report on June 7, 2007, noting that Plaintiff no longer had headaches and that she scaled five out of five in her motor strength of tested muscles.  (R. at 344).  He recommended that Plaintiff start physical therapy and cleared her for light duty with less than ten pounds of lifting and push/pull activities, no bending, kneeling, stooping, or squatting, and alternate sitting and standing every half hour.  (R. at 327, 344).

---

[19] Maximum medical improvement is "the point at which an employee has healed to the extent possible from an injury and has become medically stationary."  Ill. Workers' Comp. Comm'n, Handbook on Workers' Comp. and Occupational Diseases 37 (2011).  It does not always necessarily indicate full recovery, but rather that the patient is no longer able to heal further.
[20] A bleb is a large blister.  *Dorland's.*

Dr. Ascano also noted that Plaintiff's neck and head pain had improved after the surgery.  (R. at 405).  There were complaints, however, of sharp shooting pain into Plaintiff's head that lasted thirty seconds to one minute in her physical therapy report.  (R. at 306).  Plaintiff also told Dr. Ascano about short-lived headaches two or three minutes after exercise and occasional problems with her back locking on/off.  (R. at 403).  He assessed that she had hyperlipidemia.[21]   (R. at 404).  Plaintiff did not complain of any further headaches between July 2007 and December 2009, except for two occasions of sinus pressure/headaches in December 2007 and April 2008.  (R. at 373-403, 529).  Thereafter, she complained of headaches and sinus pressure once every two to three months between December 2009 and January 2011, which Dr. Ascano assessed as instances of acute sinusitis. (R. at 529-536, 539-40, 543-44, 547-48).

On July 5, 2007, Dr. Singh lifted a number of Plaintiff's restrictions and only restricted her not to lift, push, or pull greater than thirty-five pounds.  (R. at 325).  He recommended a Functional Capacity Evaluation, work hardening[22], and that she return to work.  (R. at 325).  On August 10, 2007, based on his evaluation of Plaintiff's Functional Capacity Report and her job description, Dr. Singh concluded that Plaintiff could safely perform at a medium physical demand level with minimal heavy lifting and could return to work as a hospital runner at full duty without restrictions.  (R. at 343).  He concluded that Plaintiff had reached Maximum

---

[21] Hyperlipidemia is "a general term for elevated concentrations of any or all of the lipids in the plasma."  *Dorland's*.

[22] Work hardening is "a highly structured, goal-oriented, individualized treatment program designed to maximize a person's ability to return to work."  *The Free Dictionary*,  http://medical-dictionary.thefreedictionary.com/work+hardening  (last visited May 2, 2013).

Medical Improvement and recommended no further treatment.  (R. at 339, 343).
Dr. Ascano noted subsequent complaints of back pain on August 29, 2007, but also
noted that Plaintiff had not done her back exercises for physical therapy as
prescribed.  (R. at 397).  Thereafter, Plaintiff saw Dr. Ascano periodically for other
conditions, such as an itchy rash, but there are no documented reports of any
complaints of back pain or headaches again until May 6, 2009, when she
complained of back pain, her leg giving out, swollen glands, and sinus drainage.  (R.
367-68, 389, 391).  Dr. Ascano assessed her with cervical lymphadenitis.[23]

On August 31, 2009, Dr. Henry Rohs conducted Plaintiff's Physical Residual
Functional Capacity Assessment to complete her Social Security disability
determination.  (R. at 497).  He concluded that Plaintiff could occasionally lift up to
twenty pounds, frequently lift up to ten pounds, sit, stand and/or walk with normal
breaks for a total of about six hours in an eight hour workday, and push/pull an
unlimited amount. (R. at 498).  She could also occasionally climb ramp/stairs,
balance, stoop, kneel, crouch, and crawl, but she could never climb a ladder, rope, or
scaffold.  (R. at 499).  He based these conclusions on claimant's statements, Dr.
Singh's reports, and Dr. Ascano's medical assessment that Plaintiff's physical
systems and exam were normal other than abdominal pain.  (R. at 363-64, 498).  Dr.
Rohs did not find any manipulative, visual, communicative, or environmental
limitations.  (R. at 500-01). He also noted that Plaintiff was not prescribed any pain
medication and that although she stated that she could not sit or stand for long
amounts of time, she sat in a one and a half hour interview and got up from her

---

[23] Cervical lymphadenitis is another term for enlarged, inflamed, and tender
cervical lymph nodes.  *Dorland's*.

chair without any indication of pain or difficulty. (R. 498-99, 504). Dr. Charles Kenney reviewed the Functional Capacity Assessment on reconsideration and affirmed its findings. (R. 514-16).

Two months later, in October 2009, Plaintiff complained of back pain, right leg numbness, and burning on the bottom of her foot after walking 1/4-1/2 mile. (R. at 527-28). Dr. Ascano assessed her with lumbar radiculopathy and referred her to Dr. Orteza, but there is no record of prescribing pain medication. (R. at 527-28). Dr. Orteza described Plaintiff as a "healthy looking female . . . in good general health." (R. at 512). He noted that Plaintiff denied any headaches, that she had normal gait and a clinically straight back, and that her musculoskeletal system was "unremarkable" except for complaints of low back pain. (R. at 512-13). Plaintiff complained to Dr. Orteza that she generally has pain of five out of ten, but that "walking, standing, and sitting would significantly aggravate her pain. As a matter of fact, the pain is aggravated by any kind of activity that the patient does." (R. at 512). He diagnosed her with "chronic low back pain, most likely secondary to her lumbar degenerative disc disease with consequence spinal stenosis vs. facet arthropathy[24] of the lower lumbar spine." (R. at 513). He scheduled Plaintiff for epidural steroid injections, but she complained that it made her pain worse, so he recommended instead that Plaintiff take Neurontin[25] at bedtime for her pain and to help her sleep because she babysat during the day. (R. at 506-07).

---

[24] Facet arthropathy is a type of arthritis with disk degeneration and pain that is common in the lumbar region. *Dorland's.*

[25] Neurontin, known by its generic name Gabapentin, is a drug used to treat nerve pain. It can be used in combination with other painkillers to improve pain relief. *Drugs.com; Frequently Asked Questions About Gabapentin for Pain Relief,*

Thereafter, in December 2009, Plaintiff visited Dr. Ascano multiple times complaining of sore throat, sinus pressure and headaches, and he diagnosed her with acute sinusitis and prescribed antibiotics.  (R. at 529, 531).  In June 2010, Plaintiff complained that she fell on her knees nine days prior, which made her back pain worse.  (R. at 537-38).  Dr. Ascano assessed her with acute or clinical low back pain.  (R. at 538).  Plaintiff then took another MRI in August 2010, which showed straightening of the lumbar curvature and multilevel degenerative changes at the L4/5 and L5/S1 levels, but otherwise reported relatively the same findings as her last MRI in 2007.  (R. at 521).  On August 16, 2010, Dr. Patrick Hitchon, a neurosurgeon, reviewed Plaintiff's MRI results and noted that the MRI did not show any disc herniations or significant narrowing or spinal slippage that required additional surgical intervention.  (R. at 517).  He also noted that while Plaintiff had some changes related to the natural wear and tear of the spine with narrowing of the disc spaces, he believed that Plaintiff's pain would improve in time.  (R. at 517).  Between September 2010 and January 2011, Plaintiff saw Dr. Ascano several times and complained of headaches and back, leg, and foot pain.  (R. at 541-48).  He assessed her with hyperlipidemia, acute sinusitis, and low back pain, recommended that she stop smoking, and prescribed her ibuprofen and Tramadol.[26]  (R. at 546-48).

---

Cambridge Univ. Hosps., http://www.cuh.org.uk/resources/pdf/patient_information_leaflets/PIN0761_gabapentin_faqs.pdf (last visited May 1, 2013).

[26] Tramadol is a narcotic-like pain reliever used to treat moderate to severe pain. *Drugs.com.*

## II. Plaintiff's Hearing Testimony

Over the past fifteen years, Plaintiff has worked as a laundry and kitchen worker in a nursing home, as an electronics tester, as an assembler, in a factory, and as a secretary for a car alignment company. (R. at 49-51). The last job she held was at a nursing home.  (R. at 52). Her alleged disability stemmed from an injury at work in September 2006 when she took an overweight client from the nursing home to a doctor's visit.  (R. at 52-53).  Plaintiff had surgery following her injury that alleviated her symptoms for about two weeks, but she still experiences pain in her lower back that shoots down her right leg and sometimes her left.  (R. at 53).  She did not return to the nursing home when she was released from Workers' Compensation because her job was dissolved when the company was sold.  (R. at 52).

Plaintiff testified that she has pain daily and that everything she does causes some kind of pain in her back.  (R. at 54, 56).  She testified that she takes Tramadol for her pain twice a day and that it does not help much but that she takes it anyway because she has nothing else she can take.  (R. at 54-55).  Some days she does not take the Tramadol though so that she "will always have a pill in [her] pocket".  (R. at 56).  She also takes over-the-counter Tylenol.  (R. at 55).  Plaintiff testified that she averages around five hours of sleep a night because the pain keeps her from sleeping and that if she sleeps over five or six hours a night she is in pain all day.  (R. at 54, 62).  She does not take a sleep aid to help her sleep, however.  (R. at 62-63).  She does not nap very often either; she naps for fifteen minutes about three or four times a month.  (R. at 63).  She testified that she also gets severe headaches

when her back goes out and that she gets headaches at least two or three times a week. (R. at 74). She can instantly trigger her headaches if she sits in her recliner and crosses her legs; she can sometimes relieve the pain by uncrossing her legs, but other times the pain can last for hours or days. (R. at 74-75). When she gets headaches, she takes Tylenol for relief. (R. at 75).

Plaintiff lives in a second floor apartment and climbs about fourteen stairs to get up and down every day, although she has difficulty climbing stairs. (R. at 43-44). She described her daily activities as waking up at about 7:00-7:30 A.M., making coffee, moving around the house for a while to stretch, and then getting on the computer, watching television, or sitting at her dining room table to do bills and other home activities. (R. at 63). She is in her recliner or her computer chair most of the day and can adjust her computer chair up or down if it bothers her back. (R. at 73). She testified that she could sit and work on her computer about thirty minutes before she had to get up because her back gets sore, pain shoots up her spine from the lower right side, and her leg goes numb. (R. at 60, 64, 80). To alleviate her symptoms, she sits in various positions, stretches her leg out, or moves, shuffles, or stands. (R. at 57, 60, 77-78). When she stands up, she usually walks around her apartment for about five minutes before she sits back down. (R. at 60-61). She does not use any assistive devices other than having a higher toilet seat. (R. at 44). She testified that she could stand or walk about 10-15 minutes, or walk from a quarter of a mile to a half a mile, before she absolutely had to sit down. (R. at 58-60). She walks up to a half a mile on a treadmill at home about once a

week.  (R. at 59).  Plaintiff estimates that she could lift fifteen pounds occasionally and five pounds frequently throughout the day.  (R. at 57-58).

Plaintiff does her own laundry and can load the basket and carry it down the stairs by herself with a laundry bag over her shoulder.  (R. at 44, 66).  On days that she does laundry she goes up and down the stairs every forty minutes for about three or four loads of laundry.  (R. at 44).  She testified that her back pain keeps her from lifting too much or from reaching above the cabinets and that doing the laundry causes her back pain to be more severe.  (R. at 55, 57, 61).  Plaintiff goes to the grocery store herself, but sometimes she uses a motor cart when she cannot push the grocery cart, and her husband helps her if she needs to pick up heavy items like milk.  (R. at 65). She does most of the cooking at home, but her husband helps her lift heavy dishes.  (R. at 66, 81).  She also washes the dishes herself standing in short intervals.  (R. at 55).  She dresses herself but has difficulty getting dressed some days.  (R. at 67).  She has some problems with certain shower activities as well, such as shaving her legs, and cannot bend over to wash her feet. (R. at 67).  She only takes showers rather than baths because she cannot get out of the bathtub.  (R. at 95).

Plaintiff has a number of hobbies such as reading cookbooks, baking, and decorating cakes.  (R. at 68-70).  She also tries to camp every weekend during the summer with her family in their popup trailer.  (R. at 69-70).  She drives "pretty much every day" and drove herself to the ALJ hearing.  (R. at 45).  She also drives almost thirty miles every weekend to see her best friend and her mother.  (R. at 71). Overall, Plaintiff estimates that she has about fifteen good days a month where she

is able to do activities.  (R. at 72). On a good day, she can do laundry and can go out with her friends or her family.  (R. at 72).  On bad days, her husband or daughter will help her with household activities because she cannot sit or stand anywhere and just gets up and down to try to alleviate her pain.  (R. at 67, 72, 81).  She can trigger a bad day by lifting something she is not supposed to lift.  (R. at 72-73).

## III. ALJ Decision

The ALJ considered Plaintiff's back disorders a severe impairment but did not find that Plaintiff had any spinal abnormalities that satisfied the criteria to meet or equal a listed impairment for disorders of the spine under Listing 1.04. (R. at 21-22).  The ALJ specifically remarked that Plaintiff was able to walk without the use of any assistive devices and that no objective imaging of Plaintiff's lumbar spine noted any nerve root compression.  (R. at 22).  The ALJ then reviewed Plaintiff's residual functional capacity and her past relevant work but concluded that Plaintiff was unable to perform any past relevant work.  (R. at 28).  When she considered Plaintiff's age, education, and work experience, however, she determined that Plaintiff could adjust to other work in the national economy.   (R. at 28).  Thus, she concluded that Plaintiff was not disabled.  (R. at 28).

To support her conclusion, the ALJ wrote that although Plaintiff's medical record reflected continuing complaints of back pain and the objective medical evidence supported the diagnosis of degenerative disc disease, she did not find evidence consistent with a finding of disability.  (R. at 24).  Instead, the ALJ found that while Plaintiff had "impairments that can be anticipated to produce a certain amount of pain . . . the record does not demonstrate clearly that she has the

significantly limited range of motion, muscle spasms, muscle atrophy, motor weakness, sensation loss, or reflex abnormalities which are associated with intense and disabling pain." (R. at 25). Further, the ALJ opined that Plaintiff's claims of extremely limited functional capacity were not demonstrated by the medical records and that the records were instead filled with subjective complaints rather than objective findings. (R. at 26). She wrote that while Plaintiff's surgery suggests that her symptoms are genuine, the evidence also supports the notion that the surgery was generally successful in relieving her symptoms, because Plaintiff did not complain about neck or back pain during numerous doctors' visits between December 2007 and June 2008. (R. at 27). The ALJ also highlighted that no physician found Plaintiff to be completely disabled due to her impairments nor did any physician restrict Plaintiff's capabilities beyond the level in the ALJ's opinion. (R. at 27). The ALJ referred particularly to Dr. Hitchon's assessment that Plaintiff's condition remained largely unchanged since her surgery in 2007, at the time when Dr. Singh approved her to return to medium work with no restrictions. (R. at 26). The ALJ also noted that Plaintiff had not completed her physical therapy as prescribed and surmised that her pain would improve were she compliant with her medical regimen. (R. at 27).

Further, the ALJ assessed Plaintiff's testimony and found Plaintiff independent in all her daily activities other than with heavy lifting. (R. at 26). She noted that Plaintiff told Dr. Orteza that she babysat children during the day, which the ALJ found both physically and emotionally demanding. (R. at 26). The ALJ also reviewed Plaintiff's allegation of disabling headaches, but disagreed with that

assertion.  (R. at 22).  She wrote that the record reflected infrequent complaints of headaches to Plaintiff's doctors, and noted that Plaintiff saw Dr. Ascano numerous times between November 2007 and June 2008 without any mention of headaches. (R. at 22).  She also mentioned Plaintiff's testimony that she took only over-the-counter Tylenol for her headaches and that no prescription medication was prescribed.  (R. at 22).  The ALJ concluded that the headaches were a non-severe impairment because there were no objective imaging or laboratory findings in the record relating to headaches, and therefore, there was no objective medical support for finding that Plaintiff's headaches caused more than minimal work-related limitations.  (R. at 22).

After reviewing the record, the ALJ concluded that due to Plaintiff's back pain and limited standing and walking ability, she could perform some sedentary work.  (R. at 27).  She determined that Plaintiff had the residual functional capacity to perform sedentary work with the limitations that she never climb ladders, ropes, or scaffolds, only occasionally climbs ramps or stairs, only occasionally balances, stoops, kneels, crouches, or crawls, and only occasionally reaches overhead with either upper extremity.  (R. at 23).  She accepted the vocational expert's testimony that based on Plaintiff's age, education, past relevant work experience, and residual functional capacity, there existed sedentary jobs in the regional and national economy that Plaintiff could perform, such as that of a roter and fishing reel assembler, an addresser, a document preparer, or a receptionist.  (R. at 28-29). Accordingly, the ALJ found that because Plaintiff was capable of other work, she did not qualify for disability insurance benefits.  (R. at 29).

Discussion

Plaintiff raises five arguments to challenge the ALJ's decision: 1) The ALJ erred in determining that Plaintiff's headaches were not a severe impairment; 2) The ALJ erred in not finding laminectomy defects following Plaintiff's April 2007 surgery; 3) The ALJ erred in not doing a careful examination of the record; 4) The ALJ failed to properly evaluate Plaintiff's credibility; and 5) the ALJ did not include all of Plaintiff's work limitations in the Residual Functional Capacity Assessment. (Doc. 12 at 12-18). The Court will address each argument in turn.

## I. Plaintiff's Headaches

Plaintiff first argues that the ALJ did not give full weight to the severity of Plaintiff's headaches and erroneously "state[d] [that Plaintiff] does not complain about headaches in the record." (Doc. 12 at 12-13). In assessing Plaintiff's claims, the Court cannot "reweigh the evidence" or "substitute [its] own judgment for that of the Commissioner," but rather, it can only "determine whether the ALJ's decision was supported by substantial evidence." *Clifford*, 227 F.3d at 869; *Rice*, 384 F.3d at 369. Here, Plaintiff asserts that her "headaches are a substantial reason for her disability so that the ALJ must explain why she rejected this uncontradicted evidence that [Plaintiff] suffered from severe and possibly disabling headache pain." (Doc. 12 at 14). The Court finds, however, that the ALJ did precisely that.

In her written decision, the ALJ explained that although Plaintiff alleged that she is partially disabled due to headaches, the ALJ did not find that the evidence supported that claim. (R. at 22). First, contrary to Plaintiff's assertion, the ALJ found that Plaintiff *infrequently* complained of headaches to her treating

22

providers, rather than finding that Plaintiff did not complain at all. (R. at 22). To support her determination, the ALJ cited to exhibits demonstrating that Plaintiff visited Dr. Ascano numerous times between November 2007 and June 2008 without any mention of headaches. (R. at 22). From the Court's own review of the administrative record, it found fifteen visits to Dr. Ascano's office without any mention of headaches between July 25, 2007 and May 25, 2009, except for two instances of headaches related to sinus pressure documented in December 2007 and April 2008. (R. at 383-84, 393-94). Plaintiff herself also admitted the infrequency of complaints in her brief when she wrote that "of course, she does not complain all the time." (Doc. 13 at 13). Moreover, the ALJ highlighted that when headaches did occur, Plaintiff testified that she took only over-the-counter Tylenol and no prescription medication designed to alleviate more severe pain. (R. at 75). The ALJ also noted that there were "no objective imaging or laboratory findings" relating to Plaintiff's headaches in the record, in contrast with the multiple records of laboratory tests and procedures to address her back pain. (R. at 22). Accordingly, based on these explanations, the Court finds that the ALJ has cited to substantial evidence in the form of Plaintiff's subjective testimony and objective medical evidence to support the finding that Plaintiff's headaches were a non-severe impairment.

Plaintiff extensively argues that the ALJ's conclusion is faulty because she failed to consider the severity of the headaches that Plaintiff allegedly suffered from the dural tear that occurred during her initial laminectomy procedure. (R. at 12-13). She states that her spinal surgeon, Dr. Singh, deceptively concluded that her

headaches were unrelated to her surgery because he "was not [sic] sympathetic doctor" and because he "appear[ed] more interested in protecting his reputation as a surgeon." (Doc. 12 at 12-13). To emphasize the gravity of the headaches, Plaintiff highlights a medical record from May 16, 2007, in which Dr. Ascano[27] assessed Plaintiff with a spinal headache[28] (R. at 409-10); she argues that this evidence establishes that her headaches were a severe impairment caused by a surgical error and that it should merit immediate reversal because it "is not harmless error." (Doc. 12 at 14). The Court, however, finds that Plaintiff's logic is flawed and that even if the ALJ erroneously concluded that the headaches were a non-severe impairment, her finding would not constitute reversible error for two reasons.

First, while the ALJ did not consider Plaintiff's headaches to be a severe impairment, her determination did not preclude her from proceeding through the five-step disability evaluation process because she did find the back disorders to be severe. (R. at 22). While an ALJ "is required to consider the aggregate effects of a claimant's impairments, including impairments that, in isolation, are not severe," nothing in the ALJ's decision indicates that she did not consider the impact of Plaintiff's headaches on her other impairments. *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008) (citing 20 C.F.R. § 404.1523; *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003)). The ALJ generally addresses Plaintiff's record of

---

[27] The Court assumes this is the medical record to which Plaintiff meant to cite, as her brief states that "Dr. Singh calls it a spinal headache (R. 411)," (Doc. 12 at 8), but the page to which she cites is neither from Dr. Singh's office nor does it have any notes about a spinal headache.

[28] A spinal headache is a "headache occurring a few hours after lumbar puncture, due to lowering of intracranial pressure after leakage of cerebrospinal fluid." *Dorland's*.

headaches and does not explicitly address the dural tear, but this does not constitute reversible error as she "need not discuss every piece of evidence in the record." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009).

Furthermore, Plaintiff cites only to the dural tear as the cause of her "severe and possibly disabling headaches." (Doc. 12 at 12-14). The dural tear occurred during Plaintiff's initial laminectomy procedure on April 17, 2007, but it was then corrected during her second laminectomy procedure on May 25, 2007. (R. at 330). Thus, even if the dural tear did cause Plaintiff to have disabling headaches, either in isolation, or in conjunction with her back pain, Plaintiff would still face the obstacle of the durational requirement set forth in § 404.1509 because the condition was eliminated only one month after it began. *See* 20 C.F.R. § 404.1509. Although Plaintiff cites to periodic instances of other headaches, she does not allege any cause of severe or disabling headaches other than those symptomatic of the dural tear that was repaired on May 25, 2007.

Thus, the Court finds that the record substantially supports the ALJ's determination that the headaches were non-severe impairments, but that even if the ALJ erred it would not create reversible error as the Court believes that the ALJ would reach the same result on remand. *See McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) ("Administrative error may be harmless; we will not remand a case to the ALJ for further specification where we are convinced that the ALJ will reach the same result.")

**II. Alleged Laminectomy Defects Following April 2007 Surgery**

Plaintiff next argues that the ALJ erred in not finding laminectomy defects following her April 2007 surgery.  (Doc. 12 at 14).  She contends that the "ALJ listed the surgery and the MRIs but only lists the conclusions so we can understand that she missed the dural leaks and the laminectomy defects."  (Doc. 12 at 14).  This argument, however, is mistaken.   The May 2007 MRI explains that the laminectomy defects are demonstrable as a residual small central disc herniation causing mild thecal sac effacement and an enhancement of the granulation tissue within the operative bed.  (R. at 480).  In her written decision, the ALJ specifically noted the May 2007 MRI that showed Plaintiff's lumbar surgery and the existence of a "residual small disc herniation caus[ing] mild thecal sac effacement."  (R. at 24, 26).   This statement is not a conclusion, but rather a direct reference to the laminectomy defect of which Plaintiff speaks.  The ALJ also referred to the lumbar wound irrigation and debridement and dural exploration, which indicates that she considered that a corrective procedure took place, but recognized that Plaintiff was cleared to work at a restricted level in her post-operative follow-up.  (R. at 24-25).

Additionally, the ALJ cited to Plaintiff's August 2010 MRI results finding that her condition remained largely unchanged since the 2007 MRI, and to Dr. Hitchon's post-operative letter finding that "any abnormalities noted did not require surgical intervention."  (R. at 25-26).  These statements demonstrate that the ALJ did not fail to find laminectomy defects, but rather that she did not consider "these findings alone of mild degenerative changes, mild spinal stenosis, and mild thecal sac effacement [as] sufficiently serious to support the claimant's alleged level of

limitations." (R. at 26). While the ALJ did not specifically refer to the enhanced granulation tissue within the operative bed, she "need not discuss every piece of evidence in the record." *Terry,* 580 F.3d at 477. Furthermore, Plaintiff fails to raise any argument as to how the omission of the enhanced granulation tissue impacts her disability determination. Thus, the Court rejects Plaintiff's argument that the ALJ did not find laminectomy defects following the April 2007 surgery, and instead finds that the ALJ both recognized these defects and sufficiently supported her reasoning to dismiss the impact of those defects in her opinion.

## III. The ALJ's Examination of the Record

Plaintiff takes issue with the following language and asserts that it reflects that the ALJ did not carefully examine the record according to the standards of *Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2007), *Giles v. Astrue*, 483 F.3d 483 (7th Cir. 2007), and *Bjornson v. Astrue*, 671 F.3d 640, (7th Cir. 2011):

> After careful examination of the evidence, the undersigned finds that the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(Doc. 12 at 15); (R. at 24).

Plaintiff's criticisms here are misguided and out of context. In *Brindisi*, the Seventh Circuit criticized the use of a paragraph with similar language to the one above when it was offered as the *entire* credibility evaluation. *Brindisi*, 315 F.3d at

787-88.   In *Giles*, 483 F.3d at 488, the Seventh Circuit disagreed with the ALJ's conclusory statements that a claimant was "less than markedly limited" in certain areas of functioning without any articulation of how the ALJ reached that conclusion, and in the *Bjornson* decision, 671 F.3d at 644-46, it criticized the heavy use of boilerplate language, particularly when it is inapplicable or incorrect.

Here, however, none of these holdings apply, because the ALJ simply used the paragraph above to introduce her findings, but then spent the following four pages citing to specific pieces of evidence to explain in detail how she reached her conclusion. (R. 24-27).   Furthermore, use of boilerplate per se is not cause for automatic reversal.  *See Richison v. Astrue*, 462 F. App'x 622, 625-26 (7th Cir. 2012). Rather, boilerplate language is problematic when the language is presented without further reasoning because it then prevents a reviewing court from being able to decipher whether the ALJ "adequately 'buil[t] an accurate and logical bridge from the evidence to [the] conclusion.'" *Giles*, 483 F.3d at 487 (quoting *Scott v Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002)).  Here, though, that problem does not exist as the ALJ solely used the language to set the standard of review and then proceeded to thoroughly explain her findings based on the administrative record. Thus, the Court rejects Plaintiff's argument that the ALJ did not carefully examine the record.

## IV. The ALJ's Credibility Determination

Plaintiff next argues that the ALJ erroneously determined that Plaintiff was not credible because she failed to properly evaluate the seven factors listed in 20 C.F.R. § 404.1529(c).  (Doc. 12 at 15).  "In disability insurance cases, an ALJ's credibility determinations are 'afforded special deference because the ALJ is in the

best position to see and hear the witness and determine credibility." *Eichstadt*, 534 F.3d at 667-68 (quoting *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). Accordingly, an ALJ's credibility determination will only be overturned if it is "patently wrong." *Id*. at 668.

The seven factors to which Plaintiff refers are the factors relevant to a claimant's symptoms apart from objective medical evidence. 20 C.F.R. § 404.1529(c). The ALJ must consider the following factors: (i) Plaintiff's daily activities; (ii) the location, duration, frequency, and intensity of Plaintiff's pain or other symptoms; (iii) precipitating and aggravating factors; (iv) the type, dosage, effectiveness, and side effects of any medication Plaintiff takes or has taken to alleviate her pain or other symptoms; (v) treatment, other than medication, Plaintiff receives or has received for relief of her pain or other symptoms; (vi) any measures Plaintiff uses or has used to relieve her pain or other symptoms; and (vii) other factors concerning her functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. § 404.1529(c).

Here, Plaintiff makes general statements contesting the ALJ's conclusions without pointing to any persuasive evidence that indicates to the Court that the ALJ's credibility determination was patently wrong. Plaintiff first argues that the ALJ failed to properly evaluate claimant's daily activities because "contrary to the ALJ's assertion, walking 1/4-1/2 mile, 3 or 4 days each month, is not indicative of SGA." (Doc. 12 at 15).  This argument is both confusing and uses the wrong standard of review. First, the ALJ must have necessarily concluded Plaintiff had not engaged in substantial gainful activity since her alleged disability onset date in

order to proceed to the next step of her five step evaluation.   (R. at 21).

Furthermore, nowhere in the ALJ decision does she equate walking 1/4-1/2 mile as

evidence of substantial gainful activity and Plaintiff does not cite to any piece of

evidence in the record to support that assertion.

Second, Plaintiff generally criticizes the ALJ for not factoring in the location,

duration, frequency, and intensity of the claimant's pain or other symptoms because

she failed to consider that Plaintiff "has had constant low back and bilateral leg

pain." (Doc. 12 at 15).  The ALJ, however, spent four pages of her written decision

explaining that despite the fact that the "medical record reflects continuing

complaints of back pain," and while the "claimant does have impairments that can

be anticipated to produce a certain amount of pain," she still believed that the

objective medical evidence and Plaintiff's testimony did not demonstrate that her

pain rendered her disabled. (R. at 24-28).  For example, the ALJ wrote that "despite

allegations of continuing, even debilitating pain and limitations, the record reflects

that the claimant has failed to even mention she was in pain to her doctors on

numerous occasions, which suggests that the symptoms were not especially

troublesome." (R. at 27).  Thus, the ALJ opinion sufficiently demonstrates that she

considered the location, duration, frequency, and intensity of Plaintiff's pain in her

decision.

Plaintiff next writes that "she was on Darvocet, Valium, and Lidoderm Patch

and is now taking Tramadol, usually 2 per day and OTC Tylenol."  The ALJ noted

that Plaintiff takes two Tramadol per day and Tylenol for her pain, but found

discrepancies between the degree of pain Plaintiff alleged and the evidence.  (R. at

24-28); *see also Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (rejecting a claimant's allegations of disabling pain even though she "had been prescribed Valium, Darvocet and Relafen, none of which are intended to treat severe pain"). Plaintiff testified that some days she did not even take a pain pill at all, which also lessens the credibility that she has regular disabling pain.  (R. at 56); *see also Filus v. Astrue*, 694 F.3d 863, 869 (7th Cir. 2012) ("In assessing a claimant's allegations of disabling pain, an ALJ must consider the claimant's daily activities and use of pain medications.")  Contrary to Plaintiff's assertion, the ALJ considered her treatment and acknowledged it when she wrote that "the claimant did undergo surgery for the alleged impairment, which certainly suggests that the symptoms were genuine." (R. at 27).  She found, however, that "[w]hile that fact would normally weigh in the claimant's favor, it is offset by the fact that the record reflects that the surgery was generally successful in relieving the symptoms."  (R. at 27).  The ALJ then pointed to Plaintiff's infrequent post-operative complaints of pain as support for her conclusion.  (R. at 27).

Plaintiff also argues that the ALJ erred in finding Plaintiff's daily activities inconsistent with disability. "[M]inimal daily activities . . . do not establish that a person is capable of engaging in substantial physical activity."  *Clifford*, 227 F.3d at 872.  Additionally, "[a]n ALJ cannot disregard a claimant's limitations in performing household activities."  *Moss*, 555 F.3d at 562.  Where the ALJ does not exaggerate Plaintiff's testimony and considers the limiting qualifications, however, the factual determination is not improper simply because an alternative conclusion could have been reached.  *Jones*, 623 F.3d at 1162.

Here, the ALJ wrote that Plaintiff "is able to do most things despite her back impairment and needs help only with heavy lifting." (R. at 26). The ALJ recognized that while "[t]he ability to perform these daily activities does not demonstrate the claimant is not disabled," "they do demonstrate the ability to sit, stand, walk, lift light items, concentrate to complete tasks, and otherwise perform work activity within the proscribed residual functional capacity." (R. at 26). The ALJ also cited to Plaintiff's ability to babysit during the day, which she considered both physically and emotionally demanding. (R. at 26). While Plaintiff criticizes this point and alleges that "Dr. Ascano told her to stop when the boy was 8 months old," there is no citation to any piece of evidence regarding this assertion. (Doc. 12 at 17).

The ALJ also emphasized that "no physician has concluded the claimant is completely disabled due to her impairments," and that while she still considered Plaintiff's subjective complaints, she expected that "at the least, given the claimant's allegations of totally disabling symptoms, one might expect to see some indication in the treatment records of restrictions placed on the claimant by the treating doctor." (R. at 27); see also Powers, 207 F.3d at 435 ("The discrepancy between the degree of pain attested to by the witness and that suggested by the medical evidence is probative that the witness may be exaggerating her condition. For the hearing officer to rely on this as evidence of a lack of complete candor cannot be deemed patently wrong.").

The ALJ opined further that "the claimant's pain would be improved, at least somewhat, were the claimant compliant with her medical regimen" and that Plaintiff "had not done the exercises for physical therapy as prescribed." (R. at 27).

Plaintiff alleges that she understandably did not comply with her physical therapy because "she was still having lots of back pain." (Doc. 12 at 18). This excuse, however, does not comply with the typical examples of good reasons to not follow prescribed treatment. 20 C.F.R. § 404.1530(c). Moreover, a contrary argument could be made that Plaintiff would not have had "lots of back pain" had she followed her prescribed treatment of physical therapy.

Thus, the Court finds that the ALJ sufficiently considered the seven factors outlined in 20 C.F.R. § 404.1529(c) and provided ample explanation for the reasons she found Plaintiff's testimony non-credible. *See Pepper v. Colvin*, 712 F.3d 351, 362 (citing *McKinzey*, 641 F.3d at 891) ("'an ALJ's 'adequate discussion' of the issues need not contain 'a complete written evaluation of every piece of evidence.'"). The record certainly does not show the ALJ's determination was patently wrong, and simply because the evidence could have resulted in a different conclusion does not make the credibility determination erroneous. *See Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010). Accordingly, the Court affirms the ALJ's credibility determination.

## V. Residual Functional Capacity

Plaintiff finally argues that the ALJ failed to discuss all of Plaintiff's symptoms when assessing her residual functional capacity. "The [residual functional capacity] is the maximum that a claimant can still do despite his mental and physical limitations . . . [i]t is based upon the medical evidence in the record and other evidence, such as testimony by the claimant or his friends and family." *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008). When assessing a claimant's

residual functional capacity, an ALJ is to consider all of the alleged impairments, even those that are not severe, and to discuss whether or not the reported limitations are supported by the record. *See* 20 C.F.R. § 416.945(a)(2); SSR 96-8p, 61 Fed. Reg. 34474 (July 2, 1996). Plaintiff argues that the ALJ did not accurately determine her residual functional capacity because she failed to consider several limitations: i) Plaintiff's need to lie down when she had headaches; ii) the impact of Plaintiff's pain on her concentration; iii) the time that Plaintiff would be off task by switching positions between sitting and standing; and iv) Plaintiff's need to be off task for as long as fifteen minutes each hour. (Doc. 12 at 18-19).

Plaintiff's arguments are unavailing, however. In her hypothetical to a vocational expert, the ALJ specifically asked him to assume that an "individual would need the opportunity to change positions at will at least one time every 30 minutes from sitting to standing or standing to sitting." (R. at 100). The vocational expert listed the existence of some occupations, such as a receptionist position, that "would allow good latitude for . . . a change to standing, certainly every 30 minutes, [f]or at least a few minutes." (R. at 103). Plaintiff concedes this point, but writes that "[w]hile it is assumed the employee could [change positions between sitting and standing]," the ALJ erred because "it was not considered how often [Plaintiff] would be off task during this switching of positions." (Doc. 12 at 18). Plaintiff does not cite to any piece of evidence that indicates that she would need to be off task beyond the time it takes to switch from one position to another, however, and therefore the Court rejects this argument.

Plaintiff also points to the vocational expert's testimony that if an individual needed a fifteen minute break every hour, it would preclude her from doing all jobs of a competitive nature.  (Doc. 12 at 18); (R. at 105).  Again, however, Plaintiff does not cite to any evidence in the record that supports the assertion that this limitation applied to her.  Rather, the ALJ brought up this scenario as a more restrictive hypothetical based on some of Plaintiff's general complaints of pain and fatigue, but ultimately chose not to adopt it.  (R. at 28-29, 105).  That is not to say that she did not consider Plaintiff's subjective complaints of pain, however.  The ALJ specifically notes that her assessment was more restrictive than any medical assessment of Plaintiff's capabilities, and that even though Dr. Singh released Plaintiff to perform at a medium exertional level, the ALJ wanted to give Plaintiff "every benefit of the doubt" in considering her pain.  (R. at 27).  Thus, she determined that "due to the claimant's back pain and limited standing and walking ability. . . the claimant can perform [only] sedentary work."  (R. at 27).  She also considered Plaintiff's "subjective complains of exacerbation of her pain when overhead reaching" to determine that "claimant is limited to no more than occasional overhead reaching with either upper extremity."  (R. at 27).  Plaintiff contends that her pain interfered with her inability to concentrate, but no medical record makes any reference to impaired concentration or to any mental limitations whatsoever.

Plaintiff's final argument lacks sufficient support as well. She argues that the ALJ failed to include her need to lie down when she got headaches, (Doc. 12 at 19), but she does not point to any source or authority to support this contention. Moreover, the Court believes that the ALJ sufficiently addressed Plaintiff's

headaches when she determined that they caused minimal work-related limitations given Plaintiff's infrequent complaints. Thus, the Court finds that the ALJ adequately considered Plaintiff's limitations in determining that she had the residual functional capacity to perform sedentary work, and does not find that Plaintiff has presented any substantiated argument demonstrating otherwise.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision denying disability insurance benefits is affirmed. IT IS THEREFORE ORDERED that Plaintiff's Motion for Leave to File Excess Pages (10) is GRANTED, Plaintiff's Motion for Summary Judgment (Doc. 11) is DENIED, and Defendant's Motion for Summary Affirmance (Doc. 14) is GRANTED.

CASE TERMINATED.

Entered this 8th day of May, 2013.

s/ Joe B. McDade
JOE BILLY McDADE

United States Senior District Judge